# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LUCRETIA GEORGIA-MAE HOWARD, ) </br> ) </br> Plaintiff, ) </br> ) </br> vs. ) </br> ) </br> MICHAEL J. ASTRUE, ) </br> Commissioner of the Social Security ) </br> Administration, ) </br> ) </br> Defendant. ) | Case No. 10-cv-97-TLW |

## OPINION AND ORDER

Plaintiff Lucretia Georgia-Mae Howard, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), requests judicial review of the decision of the Commissioner of the Social Security Administration denying her applications for disability benefits under Titles II and XVI of the Social Security Act ("Act"). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge. (Dkt. # 16). Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.

## Review

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security

regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The

evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a).

## **Background**

Plaintiff was born June 19, 1981 and was 28 years old at the time of the Administrative Law Judge's ("ALJ") final decision on August 17, 2009.[1] (R. 27, 124). Plaintiff has a high school education, and was in special education classes for "all the classes except for computer and gym" since first grade. (R. 28, 402). Plaintiff's prior work history consists of work as a child care worker (medium exertion, SVP of 3), a fast food worker (light exertion, SVP of 2), a packing clerk (light exertion, SVP of 2), an assembler in manufacturing (medium exertion, SVP of 2), and an assembly line inspector (light exertion, SVP of 3). (R. 51). Plaintiff alleged a disability onset date of December 8, 2006, which was amended during the hearing to March 6, 2008. (R. 26).

Plaintiff had a hearing before the ALJ on July 22, 2009. The ALJ issued a decision on August 17, 2009, denying plaintiff's claim for benefits. Plaintiff appealed that decision to the Appeals Council, which declined to review the decision of the ALJ. (R. 1-4).

During plaintiff's hearing, her attorney stressed to the ALJ that "[t]his is primarily a mental case. There is [sic] physical issues as well going on here with pain in her back and then different problems that we'll be talking to, but here the client would indicate that the mental

---

[1] Plaintiff's applications for disability and SSI were denied initially and upon reconsideration. (R. 57-61, 62-70, 72-77). A hearing was held before ALJ Richard J. Kallsnick July 22, 2009 (R. 23-56), in Tulsa, Oklahoma. By decision dated August 17, 2009, the ALJ found that plaintiff was not disabled at any time through the date of the decision. (R. 5-22). On January 8, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

health is her biggest factor in her impairment working." (R. 27). Plaintiff's attorney asked the ALJ primarily to consider the Medical Source Statement ("MSS") of Terry Dobson, MSW to find plaintiff disabled, stating exhibits 3F and 16F supported Ms. Dobson's MSS. (R. 26-27).

Plaintiff has never been married and has four children, ranging in age from 11 years to nine (9) months (at the time of the hearing). (R. 28). She testified she is 5'7" tall and weighs 307 lbs. Id. Plaintiff stated she could read at an elementary level, and could add and subtract, but not "as fast as a normal person would do." (R. 29). She last worked May of 2007, claiming she had not worked since because of her disability, explaining she "can[no]t sit long. [She] can[no]t stand long. [She] can[no]t – [she] can[no]t read that good, so [her] disability." (R. 30).

Plaintiff discussed her problems with anxiety attacks, describing physical symptoms and some triggers, stating "being around people" was one trigger, saying she became nervous around people, "like there's always someone after me." (R. 32). Plaintiff claimed to have at least one anxiety attack a day. Id. She stated she does not attend any school activities for her children except parent-teacher conferences. (R. 39).

Plaintiff stated she uses Zoloft (an anti-depressant) for both her anxiety and depression, claiming it stopped the nighttime anxiety attacks she suffered, but left her drowsy and feeling "jittery." (R. 33). She claimed to sleep three (3) to four (4) hours a day, stating one of the children's fathers watches them when she is sleeping, and if he is working, she stated the older children watch the younger ones. (R. 34). Plaintiff stated she was able to sleep through the night with assistance from sleeping medication. (R. 47). Plaintiff said she was able to drive, but did not because she experienced anxiety attacks when doing so. (R. 40).

Plaintiff stated she received treatment twice a week for her depression at Children and Family Services from Terri Dobson (a student worker). She discussed suicidal thoughts and one attempt which did not result in hospitalization. (R. 35, 39).

Plaintiff claimed she was unable to concentrate to complete any given task, and had difficulty remembering when to take her medication or attend appointments with a doctor. (R. 35-36). She stated that due to her memory, she neglected to take her medication "maybe three times out of a week maybe [sic]." (R. 38.) She reported crying spells approximately three (3) times a week. Id.

Plaintiff described the pain she experienced in her tailbone while sitting, stating no posture change or anything she could sit on that would relieve the pain. (R. 40). She went on to describe pain in her ankle, lower back, her right hip, a "shooting pain" that travels down her leg from her back, and in her right hand and wrist. (R. 41). She stated her pain started at a "5" on a scale of 1-10, and gradually increased with standing and walking. Id. To relieve this pain, she claimed to lie down, stating she spent the majority of her day in bed. (R. 42). Plaintiff said she could stand and move around approximately ten to 15 minutes at a time. (R. 43). She stated it was painful to hold her youngest child. (R. 42). She also stated lifting a gallon of milk hurt her. (R. 43).

Plaintiff's counsel questioned her about her weight, asking if she had noticed if her weight caused her any problems with her daily activities, plaintiff responded "[n]ot that I know of." (R. 44). However, she also stated she could not bend or stoop down, and could not walk a "whole block." Id. Plaintiff stated she would need to rest for 10-15 minutes, and use her inhaler due to asthma and shortness of breath before being able to continue. (R. 45).

Plaintiff brought a cane to the hearing, and upon questioning, stated she did not have a prescription, and that she "just went and bought one." She claimed to use it daily, even inside her home. Id. She stated she carried the cane in her dominant right hand, which is also the hand with carpal tunnel syndrome. She said her doctor gave her a splint to wear "until he performed surgery on [her] right hand." (R. 46). She claimed her ability to grasp objects and open jars was impaired by pain, causing her to drop things. Id. She stated she was able to reach above her shoulders. (R. 47).

Plaintiff claimed she was able to perform chores around the house, but that it takes her longer to complete the necessary tasks due to pain in her body and hand. Id. She said her two older children help with the housework. (R. 48).

Plaintiff stated she last used alcohol and illicit drugs in 2008. Plaintiff's attorney inquired as to what she drank and why, and what drugs were used and why. Plaintiff answered that she drank "[m]aybe a gallon" of vodka a day and smoked marijuana trying to self-medicate her depression, saying she "didn't want to live." (R. 49). She claimed since she stopped she noticed no improvement in her functioning. Id.

Chronologically, plaintiff's records begin June 17, 1988 with extensive records from her school career detailing testing performed for recommendations to the special education programs offered in the schools she attended. These records consistently show plaintiff to be well below grade level, immature for her age, to have borderline intellectual functioning, and in sum, when she graduated high school, she had the ability to read and perform basic math functions at an elementary level. (R. 393-548).

Plaintiff's medical records from Morton Comprehensive Health Services, dated October 5, 2006 through May 29, 2008, primarily cover two pregnancies, and gestational diabetes. (R. 264-321). Plaintiff was restricted in her daily activities while pregnant, with a note dated November 1, 2006 stating Michael Kelly, M.D. anticipated she could resume "normal daily activities six weeks post delivery." (R. 274). Plaintiff was seen at Morton by Dr. Kelly and Calvin Monroe[2], but these records yield no opinion evidence as to plaintiff's ability to perform substantial work after her pregnancy.

Next, records beginning January 9, 2008[3] through May 2, 2008 from Family and Children Services (R. 227-263) indicate plaintiff was diagnosed with major depressive disorder recurrent "sev w/o" and anxiety disorder, not otherwise specified. (R. 229). These records reflect plaintiff's primary consultations with Kelli Sondag, LPCUS, Jeffrey Cates, DO, Terri Dobson, MSW, and Dawn A. Gant, BA, CCMC. (R. 239-241). Dr. Cates summarized plaintiff's suicide attempts and discussed her recitation of her early life, including allegations of sexual abuse. (R. 242-243). Kelli Sontag was of the opinion that plaintiff experienced moderate limitation in the areas of "Other Psych/Environmental," "Problems Relating to Social Environment," and "Problems with Primary Support Group," giving her a GAF score of 45. (R. 253).

Dawn Gant noted during a case management visit that plaintiff reported "DRS has set her up with a psychological and physical evaluation. However, they also told her they have no funding for services at this time and that she will be placed on a waiting list." (R. 261). Ms. Gant also completed a "Mental Status Form" on May 2, 2008 regarding plaintiff noting plaintiff's reading and comprehension skills were at a second or third grade level, that plaintiff

---

[2] The record does not provide any identifying suffixes for this provider. The Court notes he is listed as examining or ordering clinician.
[3] The index shows March 6, 2008, but the dates on these records begin January 9, 2008.

reported a depressed mood with feelings of hopelessness that turn to anger, suicidal thoughts with no plan, and that plaintiff was stressed over the daily tasks of home maintenance. She went on to state she recommended continued therapy, case management and psychiatrist services. Ms. Gant opined plaintiff's "progress [was] guarded. Client has been dealing with depression and anxiety for many years. Unable to maintain employment." (R. 227). Ms. Gant noted plaintiff's memory was poor, that while she could remember two (2) step instructions, she would begin to forget the steps after a couple of hours, that plaintiff could not perform well under pressure, and that she required more frequent breaks during the job. Id.

Further records from Family and Children Services dated July 10, 2008 through June 4, 2009 show continued care from Ms. Dobson and Ms. Gant. (R. 377-381, 549-564). On January 5, 2009, Ms. Dobson completed a "Medical Source Statement – Mental" form regarding plaintiff. She noted plaintiff was markedly limited in the areas of her ability to work in close proximity to others without distraction and her ability to complete a normal work week or workday without interruption from psychologically based symptoms. (R. 375). She did note plaintiff was able to understand, remember, and carry out simple instructions and make simple work-related decisions. (R. 376). Family & Children Services records dated January 6, 2009 list plaintiff's medications as Zoloft (for depression and anxiety), Wellbutrin (for depression and smoking cessation), and Rozeram (for sleep). (R. 553). In further treatment notes dated February 20, 2009 regarding plaintiff, Ms. Dobson mentioned:

> She has a severe learning disability but she is aware of her limitations and tries to compensate. She continues to be law abiding and take care of her basic needs. Services will be focused on increasing socialization skills and reducing the impact of her anxiety (social phobia). Her compliance with treatment has been excellent. Her prognosis is good.

8

(R. 558-559). A final record from Ms. Gant dated June 4, 2009 showed plaintiff had moved to Broken Arrow and was provided referrals for services in the area. No additional appointment was set and Ms. Gant informed Ms. Dobson. (R. 564).

Records from Suzanne P. Thompson, D.O., M.P.H. at Three C's Medical Clinic dated February 17, 2009 to April 1, 2009 show plaintiff complained of tailbone pain, asthma, and hip pain among other complaints.[4] (R. 387-392). Lab test results show normal ranges on plaintiff's blood work testing except for elevated cholesterol. (R. 387-388). Typed notes show plaintiff was counseled regarding tobacco cessation, excessive alcohol use and cessation, safety from falls, a diabetic meal plan and family planning. (R. 390, 392). Dr. Thompson ordered a MRI to evaluate plaintiff's lower back pain, which showed "Normal Lumbar Spine Series."[5] (R. 392, 566).

Neurological records from J. Wade, M.D. dated June 11, 2009 and July 20, 2009 (R. 572-574), show plaintiff was diagnosed with right carpal tunnel syndrome (Dr. Wade prescribed a wrist brace) and a suggestion of lumbar spinal stenosis (Dr. Wade recommended a CT myelogram of her lumbar spine and a follow up visit in one month).[6] (R. 572, 574). Dr. Wade also noted a straight leg raise test produced pain at 45 degrees in her right leg and 70 degrees in her left. (R. 574).

Plaintiff visited Ambreen Rashid Shakeel, O.D. on July 13, 2009 complaining of prolonged blurry vision in her right eye. (R. 569). In a letter addressed to "Dr. Ankelsaria,"[7] Dr. Shakeel noted plaintiff's recent pregnancy with gestational diabetes, tentatively partially

---

[4] Most of these records are extremely difficult to read.
[5] The MRI results from Hillcrest hospital were submitted after the July 22, 2009 hearing.
[6] There are no further records from Dr. Wade.
[7] There are no records from this doctor, the only mention found is here.

9

attributing her visual problem to that condition. He requested an expert opinion from Dr. Ankelsaria, and suggested plaintiff may need "fluorescein angiography."[8] No opinion was rendered. Id.

Plaintiff was referred to Janet K. Dean, MS, Psychological Clinician on March 24, 2008 by Shelia Denson at Vocational Rehabilitation. (R. 223-226). Dr. Dean administered the WRAT-4, WAIS-III and a personal interview with plaintiff. She summarized plaintiff's background as reported to her, stated her breathing appeared consistent with her reported chronic breathing problems, then went on to discuss her attitude toward testing. Dr. Dean stated that it appeared plaintiff did not have a positive attitude toward the WRAT-4, that she discontinued difficult items quickly or did not attempt them at all. Plaintiff attempted half of the 30 items presented during the word reading portion, only 13 of 27 items of reading comprehension, 14 of 24 items presented on spelling, and stopped the 15 minute math portion after three minutes and 49 seconds, attempting only 12 of the 40 problems presented. (R. 223-224). Plaintiff's attitude toward the WAIS-III was more positive, and she appeared "conscientious, cooperative and motivated to do well." (R. 224).

Dr. Dean opined plaintiff's test scores appeared consistent with borderline intellectual functioning, and that her scores were indicative of a learning disorder. (R. 225). She placed plaintiff at the second grade level in basic academic skills. Dr. Dean's recommendations were:

> It is the examiner's opinion that the reported anxiety, depression, asthma/bronchitis and/or the medications she is currently taking for the conditions are probably more vocationally limiting than the learning disorder not otherwise specified with second grade academic skills and borderline intellectual functioning. It is recommended that records be obtained from Family & Children's Services to document the mental disorders for which she reportedly is currently receiving counseling and medication. The test results, history and

---

[8] Fluorescein angiography is a compound used to reveal features of the cornea.

examiner's observations appear consistent with a supported employment program. She is expected to require the assistance and encouragement of a job coach to learn the job and avoid discouragement during the learning process. In an academic setting, she would be expected to require accommodations for the learning disorder including: instructor notification, preferential seating, taped textbooks, oral examinations, extended time on examinations, extended time on homework, tape recorder to record classroom lectures, scribe or tape recorder to record her responses on essay examinations, remedial classes, tutors, calculator, use of calculator during math tests and exemption from math requirements to obtain a degree, if available.

Id.

Plaintiff was also referred to Ashok Kache, M.D., M.B.A., physical medicine and rehabilitation specialist on April 11, 2008 by Vocational Rehab Services for a "musculoskeletal/orthopedic examination." (R. 221-222). Dr. Kache noted under "Personal History" that plaintiff was negative for tobacco and alcohol, reportedly smoked "at one time" but quit in 2007. Dr. Kache stated plaintiff's alcohol "use even in the past was occasional. She denie[d] use of speed, meth, cocaine, or heroin. She report[ed] she did [use] marijuana as a teenager years ago, smoked once or twice but never was a regular habit." (R. 222).

Physical examination revealed plaintiff to be 5'6" tall, weighing 316 pounds. She presented with "1+" edema around the ankles. Dr. Kache noted plaintiff's musculoskeletal system showed "entirely normal ranges of the cervical and lumbar spines without exception and in both shoulders; hips [were] full in extension while standing. She [was] briefly able to rise up and walk on her heels and toes." Dr. Kache's impressions and recommendations were as follows:

> IMPRESSION:
> 1. Morbid obesity.
> 2. Asthma, currently in treatment.
> 3. Depression. She does take an antidepressant.
> 4. Genital herpes with periodic eruptions and she does take mediation.

5. No known drug allergies.

   RECOMMENDATIONS:
   1. The patient has primary care physician Dr. P Jones and she will continue with him for ongoing care.[9]
   2. At this time, I do not see a need for any labs, x-rays or other therapeutic intervention.
   3. She was advised to take either Tylenol OTC, Advil, Aleve, or ibuprofen for the pain in 'tail bone.'
   4. Vocational Rehab can proceed with assisting patient in retraining and/or job placement.

Id.

On June 11, 2008, Cynthia Kampschaefer, PSYD completed both a Psychiatric Review Technique form (R. 322-335) and a Mental Residual Functional Capacity (RFC) Assessment form (R. 336-339) regarding plaintiff. Dr. Kampschaefer evaluated plaintiff's records under categories 12.04, Affective Disorders, 12.05, Mental Retardation, and 12.06 Anxiety-Related Disorders. Under the "functional limitation" section of the Psychiatric Review Technique form (R. 332), Dr. Kampschaefer checked plaintiff had moderate restriction of activities of daily living, marked difficulties in maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration. However, these episodes of decompensation were not enough to satisfy the requirements to establish "C" criteria. Dr. Kampschaefer noted plaintiff was under outpatient mental health treatment, that recent psychological testing showed IQ scores of 74 verbal, 80

---

[9] There is a copy of a letter dated March 24, 2008 to Pete Jones, M.D., requesting his medical records for plaintiff in the record, but the Court finds no records from Dr. Jones in the record. There is a letter addressed to Dr. Jones dated February 4, 2009 from Ladena Ann Ballard, PA consist of a report and x-ray results. (R. 383-386). No obvious fracture was noted in her lower lumbar area after examining the x-ray results. Plaintiff's diagnoses were right greater trochanteric bursitis, sciatica, chronic low back pain, right lower extremity weakness, and morbid obesity. She remarked she would like to follow up with plaintiff in eight to ten weeks, but no further records are found. She did not offer an opinion regarding plaintiff's ability to work.

performance and 75 full scale, that plaintiff felt "sad and angry," and that she had loss of interests, low energy, increased appetite with a BMI of 51. (R. 334). Dr. Kampschaefer stated plaintiff had withdrawn from social contacts, avoided others, and was currently staying home to care for her children. Dr. Kampschaefer noted plaintiff had "several job failures due to her walking off the job." Dr. Kampschaefer stated plaintiff was capable of understanding, remembering and carrying out simple instructions in low stress situations without much public contact. Id.

On the Mental RFC form, Dr. Kampschaefer only listed "the ability to understand and remember detailed instructions," "the ability to carry out detailed instructions," and "the ability to interact appropriately with the general public" as "markedly limited," all other categories were marked "not significantly limited." (R. 336-337).

Dr. Kampschaefer stated in her "Functional Capacity Assessment" that:

> The claimant can understand, remember and carry out non complex short and simple instructions. She can make simple work related decisions. Due to her tendency to withdraw, interactions with coworkers and the general public should be kept at a minimum. She can be expected to interact appropriately with supervisors in low stress situations. She can be expected to adapt to most routine workplace changes.

(R. 338).

Also June 11, 2008, a Physical RFC was completed regarding plaintiff by Kenneth Wainner, M.D. (R. 340-347). Plaintiff was rated able to occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about six (6) hours in an eight hour workday, sit with normal breaks about six (6) hours in an eight hour workday, and push and/or pull was listed as unlimited. (R. 341). Referencing a physical exam in April, 2008, Dr. Wainner stated plaintiff showed a normal range of motion in all joints, no neurological deficits,

13

clear lungs with no wheezing and no need for other therapeutic interventions, that she could ambulate effectively, and any limitations were based on obesity. Dr. Wainner also noted plaintiff's record showed no emergency room or inpatient admissions for asthma. Id. He noted no postural, manipulative, visual, communicative, or environmental limitations. (R. 342-344)

Another Psychiatric Review Technique form (R. 348-361) and another Mental RFC (R. 362-365), both dated September 4, 2008 and signed by Tom Shadid, Ph.D. Dr. Shadid evaluated plaintiff under categories 12.02, Organic Mental Disorders, 12.04, Affective Disorders, 12.05 Mental Retardation, and 12.06 Anxiety-Related Disorders. Under 12.02, Dr. Shadid listed "Learning Disorder NOS, Mixed" as plaintiff's impairment. (R. 349). In explanation, Dr. Shadid's notes reflect the same points Dr. Kampschaefer discussed. (R. 359). Under functional limitations, Dr. Shadid rated plaintiff moderately limited in restrictions of activities of daily living and difficulties maintaining concentration, persistence, or pace while difficulties in maintaining social functioning were rated "marked," with one or two episodes of extended decompensation, mirroring the opinion of Dr. Kampschaefer. (R. 358). Dr. Shadid's RFC also mirrors that of Dr. Kampschaefer, with the exception of Dr. Shadid adding the statement "Clmt's allegations are considered credible." (R. 364).

On September 8, 2008, Luther Woodcock, M.D. completed a Physical RFC (R. 366-373) for plaintiff, with the exact same RFC recommendations listed by Dr. Wainner. (R. 340-347).

## Procedural History

Plaintiff alleges her disabling impairments are a learning disability, hip and foot pain, depression, and asthma. (R. 137). In assessing plaintiff's qualifications for disability, the ALJ first stated plaintiff met the insured status requirements of the Act through June 30, 2008. (R.

14

10). Next, he determined at step one of the five step sequential process that plaintiff had not been engaged in substantial gainful activity since March 6, 2008, her amended alleged onset date. Id. At step two, the ALJ found plaintiff to have the severe impairments of asthma, obesity, learning disorder, depressive disorder, and anxiety disorder. Id. He found carpel tunnel syndrome, lumbar spinal stenosis, and vision problems to be non-severe impairments. (R. 10-11).

At step three, the ALJ determined plaintiff's impairments did not meet the requirements of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525, 404.1526, 416.925, and 416.926), specifically discussing section 3.03, Asthma, noting there is no specific listing for obesity, the ALJ stated he had taken the severe impairment into consideration, and the mental listings of 12.04, 12.05, and 12.06. (R. 11). The ALJ discussed in detail the criteria for each in light of plaintiff's testimony and medical evidence of record. Id.

Before moving to the fourth step, the ALJ found plaintiff had the following residual functional capacity ("RFC"):

> … the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can lift 30 pounds occasionally, can lift 10 pounds frequently, can walk and/or stand 6 hours total in an 8 hour workday with normal breaks and can sit 6 hours total in an 8 hour workday with normal breaks. The claimant has no limitations with use of hands and feet and no postural limitations. The claimant can understand, remember and carry out non-complex, short and simple instructions. She is limited to incidental contact with coworkers and the general public. She can be expected to interact appropriately with supervisors in low stress situations. She can be expected to adapt to most routine workplace changes.

(R. 13). At step four, the ALJ determined that plaintiff was able to perform her past relevant work as a packing clerk and fast food worker. (R. 20). While not required by the sequential evaluation process, the ALJ provided an alternate finding at step five, determining that

15

considering plaintiff's age, education, work experience, and RFC, she could also perform the jobs of office cleaning (DOT number 323687014), press machine operator (DOT number 685686010), grinding machine operator (DOT number 521685078), and assembler (DOT number 732687014), based on the testimony of the vocational expert at the hearing. (R. 22). The ALJ concluded that plaintiff was not disabled under the Act from December 8, 2006,[10] through the date of the decision. Id.

## Issues Raised

Plaintiff's allegations of error are as follows:

1. The ALJ failed to evaluate or explain the weight given to evidence of record from Janet Dean, M.S., Terri Dobson, MSW, Cynthia Kampschaefer, Psy.D., Tom Shadid, Ph.D., and Luther Woodcock, M.D.,

2. The ALJ committed reversible error by not discussing the weight given to plaintiff's "treating mental health therapist," Terri Dobson,

3. The ALJ failed to comply with SSR 02-01p by not considering the impact of plaintiff's severe impairment of obesity on her ability to work; and

4. The ALJ committed reversible error by failing to consider a state agency physician's finding that plaintiff was credible.

(Dkt. # 19 at 2).

## Analysis

The Court has thoroughly reviewed the record and the parties' briefs. Based on this review, the Court firmly believes that the ALJ's ultimate finding of not disabled is correct. However, the Court must also agree with plaintiff's initial argument, since the ALJ failed to state what weight was afforded to any specific evidence.

---

[10] The Court notes a discrepancy between this date and the amended onset date, however, finds this error harmless.

For example, plaintiff first claims the ALJ failed to evaluate or explain the weight given to evidence of record from Janet Dean, M.S., Terri Dobson, MSW, Cynthia Kampschaefer, Psy.D., Tom Shadid, Ph.D., and Luther Woodcock, M.D. Plaintiff is correct. The RFC assigned to plaintiff by the ALJ <u>appears</u> to adopt limitations set out by Dr. Kampschaefer, Dr. Shadid,[11] Dr. Wainner, and Dr. Woodcock,[12] all non-examining, agency physicians. Dr. Kampschaefer's Psychiatric Review Technique and companion Mental RFC forms also <u>appear</u> to incorporate several parts, if not all, of the evaluation performed by Janet K. Dean, M.S., and the evaluation performed by Dawn Gant, B.S. of Family and Children's Services. (R. 322-339, 340-361). <u>See also</u> (R. 223-226). In addition, the ALJ <u>seems</u> to have adopted the stand/sit restrictions of Drs. Wainner and Woodcock and even restricted plaintiff's lift and carry more than the recommendations. (R. 13). <u>See also</u> (R. 340-347, 366-373). While the Court could make assumptions based on what appears or seems to be the ALJ's reasoning, such assumptions are not permitted on review. Upon remand, the ALJ should state his reasoning for the RFC he ultimately assigned to plaintiff.

Next, while the ALJ does discuss the evidence supplied by Ms. Dean, Ms. Dobson, Dr. Kampschaefer, Dr. Shadid and Dr. Woodcock, he fails to explain the weight given to each. The only clear discussion of weight occurs when the ALJ discusses the "Mental Status Form" completed by Ms. Gant, plaintiff's case manager at Family & Children's Services. (R. 16-17). The ALJ explains that Ms. Gant is not an "acceptable medical source" and, therefore, this "document" can be afforded little weight since Ms. Gant merely recited plaintiff's complaints. (R. 17). However, in his RFC determination, which incorporates at least part of the

---

[11] Dr. Shadid's report repeats the same findings of Dr. Kampschaefer with the exception that Dr. Shadid noted "Clmt's allegations are considered credible." (R. 364).
[12] Dr. Woodcock's physical RFC matches that of Dr. Wainner.

17

"documents," the ALJ failed to discuss the weight afforded both the evidence he accepted and rejected, making it impossible for the Court to follow his reasoning. For this additional reason, this case must be remanded. The ALJ is instructed to explain the weight given to all the evidence, including what weight, if any, was given to Ms. Dobson's report.

Since the case is disposed of on the first allegation of error, it is unnecessary for the Court to address the remaining allegations of error.

## Conclusion

The decision of the Commissioner finding plaintiff not disabled is hereby REVERSED and REMANDED as set forth herein.

SO ORDERED this 7th day of September, 2011.

_____
T. Lane Wilson
United States Magistrate Judge